It looks like we have all counsel here. The next case we have on the calendar is Sabra v. Maricopa County Community College District and we'll hear first from counsel for the appellants. Good morning. Good morning, Your Honor. You may proceed. Thank you so much. May it please the Court. My name is Ahmed Sousi and I have the honor of representing the plaintiff appellants in this matter, Mr. Mohamed Sabra and the Council on American Islamic Relations of Arizona or CARE-AZ. Your Honors, we request three minutes for rebuttal and I'll keep track of the clock. We are here today because a community college professor is teaching that terrorism is an undisputed part of Islam and then he punished a Muslim student for not agreeing. When this professor got caught, he went on to a podcast and explained that he had academic freedom to teach this. When in reality, this Court has held that academic freedom is not a defense to an actual constitutional violation. And that brings us to the four issues in front of the Court today. All four are reviewed de novo. First, whether the District Court erred when it failed to accept CARE-AZ's organizational standing allegations as true. Second, whether appellants pled a plausible establishment cost claim. Third, whether appellants pled a plausible free exercise clause claim. And fourth, whether teaching that terrorism is an undisputed part of Islam and then punishing a Muslim student for not agreeing are both obvious violations of the First Amendment. The answer to all four questions is yes. And we ask this Court to reverse the lower court's decision. Beginning with the first question. I wish I had another issue and hope that you will address it at some point. And that was for a claim against the College District. Yes, Judge Clifton. Now, the lower court did not get to that, so we didn't brief it because they didn't address it at all. Well, it was raised in the answering brief, and you didn't brief it in the reply brief either. The reason why we didn't, Your Honor, is because the lower court didn't get to any answer, but I could give you... No, no, no, no, no, no. That's not an answer. No, I'll... You're free to affirm on whatever ground. And they clearly raised it in the answering brief, and there wasn't word one in the reply brief about it. And as I suspect you already know, there's not Respondent Superior in this context. You've got to make a claim under the Manila liability, and there's not word one in the reply brief about that. So at some point, I'm hoping you'll address that. Yes, Your Honor. And I'll address that right now. In our actual pleadings, I believe page 187, we speak to Rule 3.6, which states that the teachers have to give their syllabus to the department chair. And we allege on page 178, Professor DeMas is the chair for Scottsdale Community College in the Social Behavior Department. And he knows exactly what's occurring in that class when he teaches... Well, obviously, he knows he's the one teaching the class. He's a defendant. That really doesn't satisfy the obligation for establishing why the municipality, or in this case, the college district is liable. Is there any authority that suggests that's enough to establish liability on behalf of the governmental unit? Yes, Your Honor, because we look here for a policy, and we look for a final decision maker. Because Maricopa County Community College District gives final authority to approve syllabus to the department chair, we allege that DeMas approved the syllabus. The question I pose, is there any legal authority that supports that proposition? I am unaware of any. And you haven't cited any, and that's perhaps the greatest frustration. The issue is clearly teed up in the answering brief. Reply brief comments, not at all. Your Honor, I don't have the case in front of me, but it's the law that the final decision maker has authority to uphold the government institution. And Mr. DeMas, we allege, is the final decision maker due to Rule 3.6. 3.6 says, you turn in your syllabus, and this person will approve it. DeMas approved his own syllabus. That's what we allege, and as this court knows. Counsel, he turned in his syllabus, but did he turn in his slides and the quiz? Well, we argue, Your Honor, and it's a reasonable inference that Mr. DeMas knows exactly what he's teaching, and because he's given this... Does the college... I mean, so first of all, just to answer my question, did he turn in the slides and the quiz? It says turn in the syllabus, and I want to take one step back, Your Honor, to at this stage, at the motion to discuss... But you're not really pointing to the syllabus as the problem, right? You're pointing to the slides and the quiz questions as the problem. So how could a superior at the college have even spotted this, if that wasn't part of what had to be turned in? Your Honor, we'd argue that because Mr. DeMas knows what's in his own presentation, he has the ability as the final decision maker, and that's the standard. I apologize, I don't have... But what authority do you give us for that proposition? I mean, suppose a patrolman on the beat beats the crap out of somebody. That doesn't necessarily, because he happens to be the final decision maker in the encounter, that doesn't make him a decision maker to make a policy that would make the city police department liable. So you're telling me your allegation, but you haven't given anything that suggests that's actually what the law tells us. So, Your Honor, I would say the one thing in the hypo that distinguishes exactly the issue here, and in the 1983, at least brief, but the Ninth Circuit does... I apologize, I can't remember the cases, but it's Supreme Court cases. DeMas is the final decision maker. The difference between an officer on the street, he's not making policy decisions for the police force. Under Rule 3.6, as we allege, teachers have to turn in their syllabus to the department chair. Professor DeMas is the department chair for the Social Sciences and Behavior Department. And to your question, Judge Dyke, he knows exactly what he says and what he teaches, that terrorism is justified and encouraged in this land. He knows this. Mr. Susi, can we move to what he said? Because it's the turn of the heart of the First Amendment issues that are raised. My first question is, if you didn't have the quiz, let's put the quiz off to the side. I recognize the quiz is an important part of your argument, but I just want to put it off to the side for a moment. If you didn't have the quiz and all you have is the slides, do you have a case? Yes, Your Honor. For both the Establishment Clause, and I understand we're putting the quiz to the side, but I don't want to mention that under the Establishment Clause, it's the primary effect of the entire module. And our free exercise clause is on the quiz. But just to answer the slide questions, on page, and I would like this court to please look at the exact words, on page 137 of the slides, Mr. DeMas teaches that contemporary Islamic legal authorities are unanimous in their approval of not only terrorism, not only suicide attacks, but also a war against unbelievers. This type of disparagement of Islam doesn't stop. On page 144, DeMas states that Muslim popular opinion has some sympathy for terrorism. Since you're short on time, I think we all read that. And so I understand the gist of your argument there. The question I've got for you is, if you're right, it creates sort of a challenge in that, let's use Aztec, I'm not sure if there's still Aztec child sacrifice as a religion out there, but let's say there's an Aztec religion and they're doing child sacrifice or something, and somebody writes about child, I think most people would agree that that's not a positive thing, that that would be a negative thing. But if this person writes about it, whether they're right or wrong, first of all, if they're right, can they not write about it because it's disparaging? Can they not teach about it because it's disparaging? And somehow that creates, that's a problem under our endorsement slash disapproval. And then even if they're wrong, if they honestly believe it, can they not write about it? Your disapproval argument has that difficulty of squelching speech about a religion. And that seems like a problem. Let me make it easy for you, Judge Van Dyke. Yes, of course, they can write about it. And Mr. Damask can, of course, write about Islamic terrorism. He has to do it in a way that doesn't disapprove of religion and fit the constitutional requirements of the Establishment Clause. How do you do that? Well, this court answered that question in multiple cases. We cite to Vernon, which says you need prominent disclaimers. We cite to Tor Larkson, where it says competing theories, and especially how you teach about it. You're going in a way, in a historical way, how they did in Tor Larkson, how this court said, this is just talking about the actual movement of the region. Let me use an example from Christianity that will illustrate my concern. Are you aware, like Jesus actually says in the Bible that you should hate your parents? Are you aware of that? Let's just stipulate. And Luke something, Luke 14, 26. So if somebody taught that Jesus said in the Bible that you should hate your parents, that's actually in the Bible. Like this literally says that. But it also could be considered disparaging. And I think many Christians would think you shouldn't hate your parents. And so what would I think under your argument, we would have to say, well, that was disparaging. And you taught that and you gave a quiz on it, but it's in the Bible. It's difficult to know how we avoid that problem with the position you're taking. And this relates both to your establishment clause and your free exercise clause arguments. So, so, Your Honor, I would say that that is it rises to level of disparagement as saying that terrorism is unanimous. Terrorism is kind of exact language that the Supreme Court struck out in your parents. I mean, most people don't think you should hate your parents. Of course not, Your Honor. But when you teach that terrorism is encouraged and justified, I would argue that that level of disparagement rises to a higher degree than hate your parents. And even if this court believes hate your parents is on that same level, there's different ways. And if we look to that primary effect, would a reasonable object observer conclude that the primary effect disapproves of religion? And we look at the case law. When you turn to the quiz, because the district court, and I think the defendants here say that the quiz wasn't asking, wasn't sort of a test of religious faith. It was merely asking him to say what he was taught in the class. And how do you respond to that? So, Your Honor, I would argue that what was taught was that terrorism is undisputed part of Islam. That is why the questions are written so narrowly. Where is terrorism encouraged? Where is it justified? This court can look to page 220 and 225 in the exact language. The wrong answer to both of those questions is it's not encouraged and not justified. Mr. Sabra was forced to make a decision either disavow his religion to receive points or uphold his religious beliefs and lose points. And when we look to what does the case law say? Well, for an American family, as well as Roe, this court says it looks for compulsory government action. So, counsel, let me bring back the hate your parents thing, because this is a difficulty about it. So if question nine was, where is hating your parents encouraged in the Bible? And then the last answer was it's not encouraged in the Bible. I don't actually think that hating your parents is encouraged in the Bible, but there is that Luke verse. So I would probably think the last question was the right answer. But the first question is what the professor thought was the right answer. It's hard to see. It's hard to see that like he's sort of objectively wrong unless we all like put on our, you know, our become high priests of religion or something. So the problem is, is the difficulty of having is even with what you want us to do with these questions, you're putting us in a difficult position of sort of like deciding, oh, this is just beyond the pale, right? Like, you know, hating your parents is not beyond the pale. And you're also turning what is essentially like bad question making into a constitutional, constitutionally significant thing. These are not good quiz questions, I would agree. But if we ruled the way you want us to rule, it puts us in a, we're basically constitutionalizing every bad question that touches on religion. Let me, let me make it easy for you, your honor. The constitution puts these requirements. The mask is obligated to follow them. It could have been extremely easy for the masks just to write where do terrorists find the encouragement or where do terrorists believe it's justified within the religion. If you're going to teach religion as a government actor, you must follow the constitution, just like this court and other courts across. Counsel is the corner of what you're saying that he, that he's a professor at a state university can never express disapproval of a religion. So the primary effect of that action cannot reach that level. And just like the approval of religion, this court has held that courts or the Supreme court has held that you can't do prayer in class. And the third circuit has also said that when a high school football coach said my academic freedom, I want to teach in a way where we do prayer before games. The court said, no, there are certain requirements, certain bounds that government actors are bound by. And one of those is the primary effect cannot be disapproval. And for the burden, you can't do a compulsory government action. But this court said into a large set that offensive content that penalizes a religious belief is our offensive content that does not a burden. Religious belief is not a substantial burden. The inverse is true. Offensive content that does penalize religious belief is the substantial burden. I'd like to reserve time unless you're honest. Why don't you do that? I think that makes sense. And why don't we hear from, uh, at the least morning honors, Dave Garner on behalf of Maricopa community college district. And I would like to reserve three minutes for Ms. Leonard to be able to address any questions or concerns the court may have with respect to qualified immunity for her client, Dr. Damas. Uh, turning first to, to the, the merits, uh, the first amendment religion clauses do not forbid teaching college level course contact that content that offends Mr. Sabra's religious sensibilities or requiring him to demonstrate understanding of that content. And that's what occurred here. And that's why the trial court was correct in confirming that the challenge course content does not, uh, support plaintiff's claims when viewed in context, even under rule 12 B six standards. I think, I think the, the motion to dismiss standard matters here may matter here because especially on the questions, the district court and your clients are essentially arguing. They were asking him to restate what he had learned in the class, but the questions are very stark. They're sort of black and white questions given how they were written. And there's been no discovery in the case. That's true. Your other has not been discovery, but the relevant question here is, is there dispositive context and, and there is dispositive context and that will not change with respect to discovery. Uh, if you look at the context in which those questions and the slides were presented is number one, this was a college level course about world politics, not about religion. That's not going to change with respect to discovery. Number two, the module was focused on terrorism, not on mainstream Islamic beliefs. Can you elaborate on that first one? Cause that was our, that argument was in your briefs, but I'm just trying to figure out, is there like a different establishment clause free exercise standard? If the course is about religion, I never quite understood why that makes a difference. It makes a difference because the, the argument that the, that the plaintiffs have asserted is that the only interpretation of Islam that is offered in the course is that it disparages religion. It disparages Islam. And in fact, the context totally undermines that. So if I go into a class knowing this is a class about politics and not a class about Islam, and that this is a module about terrorism, not a, not a class about mainstream Islamic beliefs. Then I go in I'm an, as an informed and reasonable observer, I expect that the discussion about Islam is going to be tied to how terrorists justify their beliefs by reference to, well, that's one, that's one, but we weren't in the class. We don't have any testimony, any deposition from anybody who taught the class or was in the class or who approved the class. What we have are a set of quiz questions and some slides. And the slides are at times they attribute some of the statements to others, but other times that that's not clearly the case. Well, your honor, it's important to keep in mind that that was the class. The class was an online course. There was no in-person lecture. The slides were the lecture. The quiz was the quiz. The reading was the reading. So we essentially have in front of the court, all of the content of the course. And the question is reading that in context and the slides presented, excuse me, with the slides presented by the professor, the slides were available for the students to review and read. So they, they're the, the interaction between the professor and the student was via email, which is what occurred in this case. And, and, and again, the dispositive, the question is, is there dispositive context for the slides and the, and the quiz questions. And there is in addition, the slides don't purport to offer. Is there any lecture components of the students have any class time, even online? No, your honor. If the, the interaction, if the, if the students have a question, they email the professor and he responds, which is exactly what occurred here. And exactly what we expect to happen in a college level course where the students have question or may be confused about the course content. And that's exactly what happened here. The student reached out to the professor and said, I don't understand this. I'm confused by this. And to the extent he was not, didn't understand the, the, the, the gist of the context through the fact that this was a politics course, and we're talking about Islamic terrorism, professor Damas was very clear in the email exchanges with him that this is a course about explaining international politics, that the content of the slides and the questions may be quite wrong headed with the terms he used, or that the individuals espousing them may have twisted them from a curl of truth into something horribly misguided. And that the point here is not whether the terrorists are right or wrong, but the Mr. Sabra should approach the course thinking simply what beliefs motivate terrorists, no matter how wrong they may be. There's no way to come away. What's the statement made after he's taken the quiz and lost points by not giving the answer that the professor sought? Your honor, there, there was nothing that would prohibit him from, from communicating with a professor before he took the quiz. And you don't know what the quiz questions are going to be at that point. So I'm, I'm not sure that communicating separately with the professor to express concern about quiz questions that aren't qualified and do appear somewhat loaded is a very satisfactory response. Well, and, and that, your honor, is why it's important to make sure that, that the quiz, as well as the slides, are viewed in the context in which they were presented. Well, is the context that a student is supposed to understand in answering a quiz or a test, the mission is to regurgitate to the instructor what the instructor wants to hear, as opposed to giving a academically correct answer? Well, an academically correct answer would be reflecting what the content was presented in the course. Well, but the questions are written in such a narrow way that I'm not sure they, a reasonable person would have perceived them that way. But a reason, your honor, a reasonable person would, would understand I'm taking a world politics course, and that this is a discussion about terrorism and about the justifications offered by terrorists, specifically by individuals who espouse Islam as a basis for their terrorist acts. That's the context within which a student taking the quiz should approach it. And that's the context within which Dr. Davis clarified. How do you address the slides, some of which are attributed to other sources, but some of which seem more freestanding and are also accompanied sometimes with photos of children suggesting they may be future terrorists. And that's why, your honor, the discussion of terrorism did not purport to offer the only interpretation, but it was the relevant interpretation. Those slides reflect what a terrorist who is attempting to justify his or her actions through resort or reference to Islamic doctrine and beliefs would say, would espouse. And that's the context within which the material was presented. Well, take a look at question nine. It says, where is terrorism encouraged in Islamic doctrine and law? It does not say where do terrorists draw from Islamic doctrine and law to justify their terrorist acts. You're telling us that the second interpretation is the inevitable one. And I suspect it's the inevitable one that most students draw because they understand what it's like to curry favor with the instructor. But the terms used in question nine don't reflect that second interpretation, do they? Or how do they? The terms in the quiz are intended to be read in context. And that's the point, is that we've had this discussion. You read the slides. I'm in a class that undisputedly the majority of the course has nothing to do with religion, much less Islam. I'm taking this quiz understanding that we're talking about terrorism and about Islamic beliefs that could purport to represent that. Could the professor have worded the questions more clearly in that regard? Certainly. But the question before the court is, is that legally mandated? And our view is it's not. And when we look at the context and that context within which the course is offered, a reasonable observer would know that this is being presented from the perspective of a terrorist justifying his or her actions. But don't you think when you look at the slides that there is a sort of disapproving flavor to them of Islam? I mean, I think it's hard to only if you ignore the context. And that's what the plaintiffs have asked the court below to do and ask the court now on appeal to do. Ignore. Take this out and pretend we're not in a world politics course. Pretend that we're just reading this on its own, disconnected from any other context. Let's pretend we're not talking about terrorism generally, and that's the focus of our discussion. Let's pretend we're talking about Islam. Well, we're not. These questions are why they don't present the only interpretation. They present the relevant interpretation for purposes of the course. And I'm going to have to answer more questions, but I don't want to impinge on Ms. Leonard's time. If you have an argument, we'll make sure she has three minutes and we'll make sure we don't have any further questions from you. But I do have one for you, which is, I guess, what are the limits on the argument about context? Because just calling it a world history class, I don't think that puts some context around it, but I'm not sure you would suggest that just because it's that kind of class, then anything goes in terms of instruction or a quiz. Of course, your honor. And that's why I framed it in the, that there needs to be dispositive context. And I believe here we do have dispositive context. And the fact that it's a world politics course is just one piece of that context. The other piece is it's a module on terrorism, not a module on Islamic beliefs and doctrines. And the third is that the discussion is surrounding how terrorists justify their beliefs and add to that the conversation that occurred through email between the plaintiff and Dr. Damas. And it's very clear there there's no way a reasonable informed observer would be able to walk away and not understand that this is not something that he's imposing as the only interpretation of that doctrine, but it's the relevant interpretation of the doctrine in the context. Okay, why don't we hear from your co counsel? We'll let her have three minutes. I know that was your intention. And we'll give Mr. Susi a little extra time on the back end. Thank you, your honor. Thank you, may it please the court, Chris Lenhart representing Dr. Nick Damas, who is our world politics professor. He has been individually as well as officially in this matter. And I just want to address really briefly the qualified immunity prong of clearly established right. You've heard opposing counsel refer to this as an obvious violation of the Constitution. The reason he has to argue for an obvious violation is because we have case law directly on point, stating that no such clearly established right exists in this matter. So he is trying to go around the established case law number referring to the Farnan case, and essentially argue that the conduct in this matter is such an obvious violation that Farnan doesn't apply. And I'm just going to talk briefly about why it does. So essentially, in Farnan, the court there was looking at a case where an AP history professor was sued by a high school student for making comments that were allegedly derogatory towards religion in general and Christianity specifically. Those statements were religion was invented when the first con men met the first fool. When you put your Jesus glasses on, you can't see the truth. That belief in God and creationism are nonsense, and not science. All the quiz like this one. That case does not involve a quiz that I'm aware of, although it probably did also have a component of testing that maybe wasn't pled as a part of the claim. Anyway, the point is, is that the statements made in Farnan were similarly derogatory towards religion. In that case, very importantly, the court notes that qualified immunity is important for our teachers. I mean, they're over overworked, underpaid, they're teaching our students, and we want them to have the freedom to make a decision about how best to challenge the critical and analytical thinking of our students. So we get to the point where the court makes a ruling. And first, they say, without any cases illuminating the dimly perceived line of demarcation between permissible and impermissible discussion of religion in a college level history class, we cannot conclude that a reasonable teacher standing in defendant's shoes would have been on notice that his actions might be unconstitutional. Court also notes that there is no prior reported reported case on this topic. And what appellants are asking today is to do away with the Farnan case. There's no argument that there has been any further illumination of this matter for my client or other educators. And to find that this was such an obvious violation. My argument today is that that is precluded by the findings in the Farnan case. Council was unable to cite to any subsequent cases that would put my client on notice, either regarding the Establishment Clause, or the Free Exercise Clause. And I submit to the court that qualified immunity is a very important fundamental issue for our educators. Again, undereducated, we're talking about their in their right to qualified immunity from individual suit. I think we have your argument. We'll now hear. Thank you. We'll now hear rebuttal from Mr. Susi. We'll give you two minutes, sir. Thank you so much, Your Honor. It's Ahmed Susi for the appellant. Judge Ress, you brought up the two reasons why opposing the other side loses. And it's the first. We're talking about a motion to dismiss. All that is required is a plausible violation. Mr. Garner kept talking about look at the context. Look at the context. The context is states that it's a unanimous position, right? That Islamic legal authorities are unanimous. Unless the Islamic legal authorities are also terrorists, that includes more than just what the terrorist believes. And question nine. Also, can I ask you, there's sort of a intermediate step that your brief kind of skips over and we haven't really talked about. And that is, it's not like Professor Damask said, Islam is bad, or I disapprove of Islam, or you know, question, you know, disapprove or approve of Islam. Instead, what he said was, you know, if you read it the way the way you want to read it, he's he's saying that it encourages terrorism. I think that that's possible that he that that's his personal view and that that's what he was teaching and that that's what he was testing on. The difficulty is, is that if he actually thinks that it encourages terrorism, if you think that a religion does something that's very bad, your position would be that you just can't you can't teach that, I think, or at least if it's bad enough. Isn't that a problem? Like that? That's a problem to say that a professor can't teach what he or she actually believes about a religion because the majority of people would then see would disapprove of that and therefore see that as disapproving of the religion. That's a really difficult problem, I think. So Your Honor, Mr. Damask can absolutely teach about Islamic terrorism. There's no question he can do that, but he must do it with this. Could he put could he say if he was right that Islam promotes terrorism like generally? I'm not obviously I don't I don't think you agree with that. But if he was right about that, could he teach it? So there's a turn on whether he's right or wrong. So, Your Honor, it's not a question about right or wrong. It's not. And so this doesn't go into this really important because if I need you to answer that question, because if he's right, if he's if he's right, if he can't teach it, even if he's right, that's a problem, right? Like then people can't even have we can't even have government actors saying things that are true about religions, but are negative, right? So it could he teach you to correct? Your Honor, yes, he could teach this. I just do want to know, does that mean we have to decide whether he's correct or not? I mean, do we have to actually decide? Absolutely not. No, no, no, not at all. You don't decide if this is right or wrong. Now, that's what the Supreme Court says. The courts don't get into doctrinal debate. But I do want to mention the way he has to teach it is with prominent disclaimers. This court said that in Vernon and I'm going to to Larkin. This court also said we look for competing theories because government actors cannot teach in a way that has the primary effect that disapproves of religion. And especially at this stage, we're only at the motion to dismiss. What is a plausible violation? I know I'm over time, Your Honor, but if I may, I just want to address. Go ahead and finish the thought and then we'll be sure. So yes, yes, Your Honor. Vernon is completely distinguishable because like you brought up, Judge Brest, that there is not that same direct hostility. And for the obvious, Hernandez supports our case. In that case, this court said cited to Judge Gorsuch when he when this point, Judge Gorsuch, some things are so obviously unlawful that they don't require a detailed explanation. And sometimes the most obviously unlawful things happen so rarely that a case on the point is itself. Mr. Sousa, let me just make a quick question. Do you have any questions? OK, I want to thank you. Thank you. All counsel. We greatly appreciate the arguments from all three of you this morning. This case is submitted. Thank you.
judges: CLIFTON, BRESS, VANDYKE